513 Pa. 236 (1986)
519 A.2d 408
Carl LUNDERSTADT and John E. Scott, Appellants,
v.
PENNSYLVANIA HOUSE OF REPRESENTATIVES SELECT COMMITTEE To Investigate Compliance With the Steel Products Procurement Act, Appellee.
Supreme Court of Pennsylvania.
Argued June 3, 1986.
Decided December 22, 1986.
*237 *238 Charles F. Scarlata, Pittsburgh, for appellants.
Reizdan B. Moore, Pa. House of Representative, Harrisburg, for appellee.
Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

OPINION ANNOUNCING THE JUDGMENT OF THE COURT
FLAHERTY, Justice.
The instant case arises as a test of the validity of certain subpoenas duces tecum issued in the course of a legislative investigation of improprieties involved in the construction of the Capitol Addition Project for the Capitol Complex in Harrisburg, Pennsylvania. The Commonwealth Court, via memorandum opinions and orders, denied motions to quash the subpoenas. The instant consolidated appeal ensued.
*239 In 1981, when the Commonwealth initiated the Capitol Addition Project, the appellants, Carl Lunderstadt and John E. Scott, were asked to serve as consultants on the use of granite stone in the Project. Appellants were the owners of a firm known as North American Industries. In 1983, North American Industries was awarded a lucrative no-bid contract to supply granite for the Project, and, in 1984, North American Industries received further benefit when it received a substantial "commission" when a general construction contract was awarded to a firm which selected as its granite fabricators a consortium assembled by North American Industries.
It was to investigate these matters that subpoenas duces tecum were issued to appellants by the appellee legislative committee, the Pennsylvania Select Committee to Investigate Compliance with the Steel Products Procurement Act (hereinafter Select Committee). The Select Committee had initially been formed to investigate compliance with legislation limiting the use of foreign steel products in the Capitol Addition Project, but later the scope of its investigation was broadened to include matters relating to improprieties connected with this as well as other state construction projects. Specifically, at the time the subpoenas were issued, the Select Committee was acting pursuant to House of Representatives Resolution 17 of 1985 (Printer's Number 307), which provided that the Select Committee should investigate not only compliance with legislation limiting the use of foreign steel but also "other matters relating to compliance with State Law in the performance of State construction projects. . . ."
It is well established that a function of legislative committees is to find facts and to make recommendations to the legislature for remedial legislation and other appropriate action. Commonwealth v. Brandamore, 459 Pa. 48, 53-54, 327 A.2d 1, 3-4 (1974) ("The power to investigate is an essential corollary of the power to legislate. The scope of this power of inquiry extends to every proper subject of legislative action."). As stated in McGinley v. Scott, 401 *240 Pa. 310, 320, 164 A.2d 424, 429 (1960), "The right to investigate in order to acquire factual knowledge concerning particular subjects which will, or may, aid the legislators in their efforts to determine if, or in what manner, they should exercise their powers, is an inherent right of a legislative body, ancillary to, but distinct from, such powers." It was pursuant to this power that the instant legislative committee investigation was being conducted, ostensibly in an effort to propose remedial measures to protect the Commonwealth's interests in not being victimized by those who would perpetrate improprieties in matters relating to state construction projects.
During its investigation, the Select Committee received sworn testimony indicating that officials of the Commonwealth's Department of General Services had knowingly issued orders to quarry granite for the Capitol Addition Project without first obtaining the requisite authorizations, met with members of the fabricating consortium assembled by North American Industries several months prior to receipt of bids for that work, and that appellants had allegedly solicited "payoffs" from prospective suppliers to "take care of people" so as to influence the award of contracts for work on the Capitol Addition Project. Testimony was also presented to the Select Committee that appellants attempted to conceal these payments by having them made to family members and business associates or creditors, and by mischaracterizing the purpose of cash withdrawals from accounts over which they had control.
In an effort to discern further details regarding these alleged schemes to subvert governmental decision making and bidding procedures, the Select Committee issued the instant subpoenas to appellants commanding them to produce broad categories of financial records covering the period 1981-1985, such being the period during which appellants worked on various aspects of the design and construction of the Capitol Addition Project. The subpoena issued to Carl Lunderstadt was identical in scope to the one issued to John E. Scott, and it read as follows:

*241 WE FURTHER COMMAND YOU, At such place and time, to bring with you the following for calendar years 1981, 1982, 1983, 1984, and 1985:
1. Monthly statements of any and all checking accounts indicating receipts, disbursements and balances, including cancelled checks for accounts of Carl Lunderstadt, his wife and dependent children;
2. Monthly statements of any and all savings accounts indicating receipts, disbursements and balances for Carl Lunderstadt, his wife and dependent children;
3. All other monthly financial statements indicating receipts, disbursements and balances of accounts of Carl Lunderstadt, his wife and immediate family;
4. Records of all acquisition (by gift, purchase or otherwise) and sales or transfers (indicating the date and transferee thereof) of money market certificates, certificates of deposit, notes, bonds or stock owned by Carl Lunderstadt, his wife and immediate family.
Appellants assert that they are unable to comply with the subpoenas, in that the language of the subpoenas requires production not only of their own records but also the records of third parties, to wit appellants' wives, dependent children, etc. It is claimed that the subpoenas should therefore be quashed, so that contempt sanctions will not be incurred for failure to produce materials that are not within appellants' possession, custody, or control, and so that the rights of these third parties will not be determined by means other than through issuance of subpoenas directly to such third parties. During the hearing before the Commonwealth Court, however, counsel for the parties agreed and stipulated that appellants would be relieved from complying with that portion of the subpoenas which required them to produce records for accounts, etc. that were in the sole control of their family members; the Select Committee reserved the right to issue direct subpoenas for the records of such persons at a later date. The agreement was approved by the court and entered into the record. In view of this stipulation, appellants' argument is without merit.
*242 Appellants also contend that the subpoenas fail to satisfy established standards by which such subpoenas are to be tested for validity. The scope of judicial inquiry in subpoena enforcement actions has evolved, to date, to include an examination of whether the inquiry is within the authority of the issuing party, whether the demand is too indefinite, and whether the information sought is reasonably relevant to the investigation. United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401, 416 (1950); Annenberg v. Roberts, 333 Pa. 203, 2 A.2d 612 (1938).
Applying the first of the criteria, there can be no doubt that the legislature has authority to inquire into whether state construction projects have become victimized by schemes to subvert existing procedures governing the award of construction contracts. Nevertheless, appellants claim that the particular resolution which created the instant Select Committee conveyed authority for the Select Committee to investigate only compliance with legislation pertaining to use of foreign steel products in the construction of the Capitol Addition Project, and that the instant investigation is therefore outside the scope of authority of the investigating body. We regard this claim as patently without merit, in view of the express language of the enabling resolution, Resolution 17 of 1985 (Printer's Number 307), supra., which in clear terms authorized the Select Committee to investigate not only the foreign steel issue but also "other matters relating to compliance with State law in the performance of State construction projects. . . ."
As to the second and third criteria by which subpoenas are to be evaluated, appellants allege that the instant subpoenas are too indefinite and too broad in their coverage, in that the subpoenas allegedly require production of a mass of books and papers that are so insufficiently described and identified as to render the inquiry a mere "fishing expedition" that would result in an unnecessary disclosure of matters not relevant to the proper scope of the Select Committee's inquiry, and appellants further argue that a *243 request for five years of the specified types of financial records is so sweeping that it borders on impossibility for compliance to occur.
The subpoenas were, however, quite specific as to the documents to be produced, and were at least limited in scope to the production of records generated during the time period during which appellants were engaged in work pertaining to the Capitol Addition Project, such being the general period during which the "payoffs" and other improprieties were alleged to have occurred. Further, the subpoenas were to some extent limited with respect to the types of records to be produced, in that only financial records rather than other types of records were to be produced, and not all financial records were requested, as, for example, the subpoenas did not command production of income tax records, etc. It can perhaps be argued, therefore, that the materials subpoenaed have been specified with all the particularity that the nature of the inquiry at this juncture permits. If the subpoenas were more narrow, as, for example, if financial records for only one or two years of the relevant five year period had been requested, or if records of savings accounts but not of checking accounts had been requested, the investigation might allow evidence of wrongdoing to slip past scrutiny, and, thus, fail in its mission of uncovering all of the sought-after data. At the same time, however, requiring the disclosure of financial records covering a five year span of time would no doubt result in revelation of many private matters that do not relate to evidence of wrongdoing. Standards governing a decision as to whether the instant subpoenas are too broad in their coverage must rest upon a balancing of the interests of the legislature versus the interests of individuals in maintaining privacy.
The nature of the balancing process involved in determining the extent to which legislative investigations may delve into private matters has been described as follows:
Broad as it is, however, the legislature's investigative role, like any other governmental activity, is subject to *244 the limitations placed by the Constitution on governmental encroachments on individual freedom and privacy. Barenblatt v. United States, supra, 360 U.S. [109] at 112, 79 S.Ct. [1081] at 1085, 3 L.Ed.2d [1115] at 1121 [ (1959) ]; Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). We approach this case with a full awareness of the threat that wide-ranging legislative investigations may pose to these protected interests. As we recently remarked in a different but related context, "our focus must always be directed toward obtaining a balance between the protection of the rights of the individual and the avoiding of unnecessary restraint upon the State in the performance of its legitimate governmental purposes. Such a balance would be frustrated if we unreasonably emphasize or deprecate either interest." Pennsylvania Crime Commission Subpoena, 453 Pa. 513, 522, 309 A.2d 401, 407 (1973); see Barenblatt v. United States, supra, 360 U.S. at 126-127, 79 S.Ct. at 1092-1093, 3 L.Ed.2d at 1129.
Commonwealth v. Brandamore, 459 Pa. at 53, 327 A.2d at 4.
In the context of a case involving a challenge as to the validity of a legislative committee's subpoena for financial records, the importance to be attached to the protection of an individual's interest in maintaining privacy, under the Fourth Amendment and under Article 1, § 8 of the Pennsylvania Constitution, was discussed in Annenberg v. Roberts, 333 Pa. at 213-214, 2 A.2d at 617-618:
It would seem scarcely necessary to marshal authorities to establish, as a proposition of constitutional law, that a witness cannot be compelled, under the guise of a legislative study of conditions bearing upon proposed legislation, to reveal his private and personal affairs, except to the extent to which such disclosure is reasonably required for the general purpose of the inquiry. . . . The question in each instance, therefore, is whether the compulsory production of private papers is an unreasonable search and seizure within the meaning of the Fourth *245 Amendment of the Federal Constitution, U.S.C.A. Const. Amend. 4, or of Article 1, section 8 of the State Constitution, P.S.Const. art. 1, § 8, and this depends upon the relevancy of the testimony which is sought, for it is uniformly held that a legislative body is not invested with any general power to inquire into private affairs and to compel disclosures but only with such limited right of inquiry as is pertinent to the obtaining of information upon which proposed legislation is to be based. None of the rights of the individual citizen has been more eloquently depicted and defended in the decisions of the Supreme Court of the United States than the right of personal privacy as against unlimited and unreasonable legislative or other governmental investigations.
Concern with protecting the privacy interest in cases such as this reflects an awareness that legislative investigations may, through inquisitions into private affairs, assume a character that is of questionable relevance to legitimate legislative purposes. Such investigations may appear, at times, to have as their real object an investigation of the personal affairs of particular individuals rather than the collection of information for legislative purposes. Indeed, in their proper realm, legislative committees are not to set themselves up as courts or grand juries rather than as entities intended to investigate and report on conditions for the information of members of the legislature. See McGinley v. Scott, 401 Pa. at 323, 164 A.2d at 431 ("[L]egislative investigations must be kept strictly within their proper bounds if the orderly and long-established processes of our coordinate branches of government are to be maintained."). Even when a legislative committee is acting within its proper ambit, however, the privacy interests of those being investigated are inherently at risk.
Recognizing the danger of legislative inquiries intruding upon privacy interests, Mr. Justice Oliver Wendell Holmes, Jr. once stated,
Anyone who respects the spirit as well as the letter of the 4th Amendment would be loath to believe that Congress *246 intended to authorize one of its subordinate agencies to sweep all our traditions into the fire . . . and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. . . . It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.
. . . The analogies of the law do not allow the party wanting evidence to call for all documents in order to see if they do not contain it. Some ground must be shown for supposing that the documents called for do contain it. . . . Some evidence of the materiality of the papers demanded must be produced.
. . . We assume for present purposes that even some part of the presumably large mass of papers . . . may be so connected with charges . . . as to be relevant . . ., but that possibility does not warrant a demand for the whole.
FTC. v. American Tobacco Co., 264 U.S. 298, 305-307, 44 S.Ct. 336, 337-338, 68 L.Ed. 696, 700-701 (1924) (emphasis added). The development of federal case law, under the Fourth Amendment, has not been such as to maintain Mr. Justice Holmes' strict insistence upon a showing of "materiality" with respect to the particular records sought by an investigatory body. See United States v. Morton Salt Co., supra. Nevertheless, we believe that the views of Mr. Justice Holmes are persuasive insofar as they reflect a need to protect individuals from "fishing expeditions," and, likewise, to the extent that a requirement as to the "materiality" of subpoenaed records should be imposed. Such protections for privacy interests can, however, be afforded under the Pennsylvania Constitution.
It is well established that states have the power to impose, under their own constitutions, more stringent standards on the validity of governmental intrusions into private affairs than those established under the Federal Constitution. See Commonwealth v. Harris, 429 Pa. 215, 219 n. 2, 239 A.2d 290, 292 n. 2 (1968). Indeed, Article I, § 8 of the Pennsylvania Constitution provides:

*247 The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.
Applying this provision, this Court has subjected searches and seizures to standards higher than those required under the Federal Constitution. Commonwealth v. DeJohn, 486 Pa. 32, 403 A.2d 1283 (1979), cert. den., 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). In doing so, we noted that "the right to be free from unreasonable searches and seizures contained in Art. I, § 8, of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth." 486 Pa. at 49, 403 A.2d at 1291. This was in keeping with other decisions of this Court recognizing that, in many respects, the Pennsylvania Constitution provides more rigorous protection for a person's right of privacy than does the Federal Constitution. Commonwealth v. Sell, 504 Pa. 46, 67, 470 A.2d 457, 468 (1983) ("Article I, section 8 of the Pennsylvania Constitution, as consistently interpreted by this Court, mandates greater recognition of the need for protection from illegal governmental conduct offensive to the right of privacy."). See also In re B, 482 Pa. 471, 394 A.2d 419 (1978). Indeed, as stated in Commonwealth v. Sell, 504 Pa. at 65, 470 A.2d at 467,
In construing Article I, section 8, we find it highly significant that the language employed in that provision does not vary in any significant respect from the words of its counterpart in our first constitution. The text of Article I, section 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those which first prompted the Commonwealth to guarantee protection from unreasonable governmental intrusion. Rather, the survival of the language now employed in Article I, section 8 through over 200 years of profound change in other areas demonstrates *248 that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.
(Emphasis added).
Accordingly, in Commonwealth v. DeJohn, supra., we interpreted Article I, § 8 of the Pennsylvania Constitution as including the records of bank customers as within the protected zone of privacy. Although the DeJohn case dealt with a subpoena in a criminal case, rather than a subpoena issued by legislative investigating committee, we perceive no compelling reason to distinguish between the two situations insofar as the extent of protection to be afforded the privacy interests concerned. Whether one's private affairs are to be disclosed in the course of a criminal investigation, or in the course of a legislative one, the intrusion upon protected interests is the same.
Article I, § 8 of the Pennsylvania Constitution does not contemplate that intrusions upon the privacy interest are to be regarded as less objectionable when they take place in the course of a legislative investigation than when they occur in the course of a criminal investigation. We would reject, therefore, such case law as has developed indicating that legislative subpoenas may be issued upon a lesser showing of cause than is applicable in criminal proceedings. Thus, when the legislature undertakes to investigate a matter, and in the course thereof it seeks to obtain records in which one has a reasonable expectation of privacy, a subpoena therefor should not issue except upon a showing of probable cause that the particular records sought contain evidence of civil or criminal wrongdoing.
Applying this standard to the instant case, we believe that the subpoenas in question are too broad in their coverage, and that they are, thus, invalid. By issuing subpoenas for five years of records, to wit sixty months coverage of broad categories of financial statements, the Select Committee has engaged in what Mr. Justice Holmes would have referred to, see discussion supra., as a "fishing expedition" designed to "search through all the . . . records, relevant or *249 irrelevant, in the hope that something will turn up." Further, even if it were to be assumed that some portion of the sixty month collection of records would yield information relevant to the Select Committee's inquiry, the situation is one where, as Mr. Justice Holmes stated, see supra., "We assume for present purposes that even some part of the presumably large mass of papers . . . may be so connected with charges . . . as to be relevant . . ., but that possibility does not warrant a demand for the whole." Indeed, by way of analogy, it appears that the Select Committee has, in this case, engaged in a "fishing expedition," and, in the course of that expedition, the Select Committee has attempted to drain the pond where fish might be found rather than to proceed with hooks and lines to the areas of the pond where there is probable cause to believe fish will be located.
Thus, based upon testimony in the hearings before the Select Committee, there should have been a basis to state with greater specificity in the subpoenas the particular types of transactions or approximate time frames with respect to which there was probable cause to believe evidence of wrongdoing might be found in the records sought. Inasmuch as the instant subpoenas failed to restrict the scope of their coverage to those records as to which probable cause was present, quashing of the subpoenas is indicated.
Orders reversed.
HUTCHINSON, J., filed a concurring opinion.
ZAPPALA, J., filed a concurring opinion which is joined by LARSEN and PAPADAKOS, JJ.
HUTCHINSON, Justice, concurring.
I concur in the result. I would quash the subpoenas, however, because Resolution 17 of 1985 (Printer's Number 307) does not have a proper legislative purpose. As this Court has stated: "the justification for a legislative investigation, whether conducted by one or both of the houses of the General Assembly, is the ascertainment of facts and *250 other relevant information to aid the members of the legislative bodies in formulating, drafting and enacting remedial or other beneficial laws." McGinley v. Scott, 401 Pa. 310, 322, 164 A.2d 424, 430 (1960). In Commonwealth ex rel Carcaci v. Brandamore, 459 Pa. 48, 327 A.2d 1 (1974), this Court upheld a legislative investigation into law enforcement policies and procedures. The resolution at issue in Brandamore instructed the investigating committee to "report its findings together with its recommendations, for remedial legislation or other appropriate action at the earliest practicable date." Id., 459 Pa. at 52 n. 2, 327 A.2d at 3 n. 2. And, in justifying the resolution in Brandamore, this Court noted that the resolution's function was "to find facts and make recommendations to the legislature for remedial legislation." Id., 459 Pa. at 54, 327 A.2d at 4.
In the present case, Resolution 17 of 1985 states:
A RESOLUTION
Appointing a select committee to investigate compliance with the Steel Products Procurement Act and other matters of State law relating to State construction projects.
WHEREAS, The act of March 3, 1978 (P.L.6, No. 3), known as the Steel Products Procurement Act, was enacted as an exercise of the police powers of the Commonwealth for the protection of the health, safety and general welfare of the people of this Commonwealth; and
WHEREAS, Numerous questions have arisen regarding compliance with the aforesaid act and the procedures used by public agencies to determine compliance with that act; and
WHEREAS, The House of Representatives is desirous of reviewing the procedures used by public agencies and other State construction projects to determine compliance with the aforesaid act and other State laws; and
WHEREAS, It is the desire of the House of Representatives to investigate compliance with the aforesaid act; therefore be it

*251 RESOLVED, That the Speaker of the House of Representatives appoint a select committee to investigate compliance with the Steel Products Procurement Act, and other matters relating to compliance with State Law in the performance of State construction projects, five members to be from the majority party and four members to be from the minority party; and be it further
RESOLVED, That in carrying out its duties the select committee may exercise all powers permitted to be exercised by standing committees as provided for in the Rules of the House of Representatives; and be it further
RESOLVED, That the select committee is specifically authorized and empowered to conduct hearings at any place in the Commonwealth to investigate any matter provided for in this resolution. Such select committee is empowered to issue subpoenas under the hand and seal of the chairman thereof commanding any person to appear before it and answer questions touching matters properly being inquired into by the select committee and produce such books, papers, records, accounts, reports and documents as the select committee deems necessary. Each member of the select committee shall have power to administer oaths and affirmations to witnesses appearing before the select committee; and be it further
RESOLVED, That the committee is authorized to hire such staff and assistants as it deems necessary and the fees and expenses therefor and the fees and expenses incurred by the committee shall be paid from accounts under the control of the Chief Clerk, not to exceed $50,000; and be it further
RESOLVED, That the select committee make a report of its investigation to the House of Representatives by the end of the current session.
This resolution does not contain even a hint that the investigation seeks to determine whether and what new law is needed to correct abuses in state construction contracts. The function of this investigating committee is limited to checking compliance with existing law. That function is *252 reserved to prosecutors, police and grand juries. This resolution is beyond any proper legislative purpose.
Therefore, I concur in the result reached in the opinion announcing the judgment of the Court.
ZAPPALA, Justice, concurring.
I concur only in the Court's judgment that the subpoenas in question are too sweeping in scope to be enforced. I reach this conclusion by applying a different standard than that announced by my brethren.
In assessing challenges to administrative agency subpoenas, the courts of this Commonwealth have heretofore regularly applied a much less stringent standard than the "probable cause" test adopted here. In re: Petition for Enforcement of a Subpoena to Anthony Semeraro, 511 Pa. 584, 515 A.2d 880 (1986); Pennsylvania Crime Commission v. Nacrelli, 5 Pa.Cmwlth. 551 (1972). The inquiry must be "within the authority of the agency, the demand. . . not too indefinite and the information sought . . . reasonably relevant." Id., quoting United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 369. It should certainly not be otherwise with the legislative branch of government itself, acting through its committees and subcommittees in carrying out legitimate legislative functions.[1]
I am cognizant of the danger that legislative investigation into compliance with existing laws to assist in drafting corrective measures or even merely assessing the need for such, can overlap, perhaps substantially, criminal prosecution for violation of the laws. I do not find it appropriate, *253 however, to abate the danger by grafting the probable cause requirement for issuance of a search warrant onto the functionally distinct legislative process for issuance and enforcement of a subpoena. Should there be a conflict between an individual's rights in the context of pending or potential criminal proceedings and a legislative request for information, I would trust proper use of existing practices and precepts, e.g., the individual's privilege against self-incrimination and the legislative power of contempt, to accommodate these interests and resolve the conflict.
LARSEN and PAPADAKOS, JJ., join in this concurring opinion.
NOTES
[1] I express no opinion as to whether a different standard would be appropriate where a legislative committee sought production of records by a co-ordinate branch of government rather than by an individual. Depending upon the nature of the legislative inquiry undertaken, the type of information sought, and other factors determined by the context, such a request might involve competing constitutional interests requiring different analysis than that appropriate where a constitutional or statutory prerogative contends with a lesser or less specific interest. See generally, In re: Petition for Enforcement of a Subpoena to the Pennsylvania Judicial Inquiry and Review Board, 512 Pa. 496, 517 A.2d 949 (1986).