## Taylor v. West Penn Hospital

*Daniel W. Ernsberger,* for plaintiffs.

*Richard J. Federowicz,* for defendant West Penn Hospital.

*Robert S. Grigsby,* for defendant Central Blood Bank.

WETTICK, *A.J.,* August 12, 1987 — Plaintiff Nicholas Taylor underwent open heart surgery on January 5, 1985. During the course of his surgery, plaintiff received blood that had been donated to and distributed by the Central Blood Bank.

On March 16, 1985, a donor whose blood had been used during plaintiff's operation again donated blood to the Central Blood Bank. During the routine testing of this donor's blood, the Central Blood Bank discovered that the donor had been exposed to the HTLV-III virus, the causative agent of AIDS.

In accordance with the procedures that the Central Blood Bank follows when it discovers that a donor's blood may be infected with any communicable disease, the blood bank notified plaintiff of the test results of the donor. Plaintiff was then tested for AIDS. The tests revealed the presence of the HTLV-III virus.

Following the discovery of this virus in his blood, plaintiff through his counsel contacted the Central Blood Bank for information regarding the medical history of the donor, the testing procedures used on the blood, general information regarding the Central Blood Bank's donor program, and the identity of the donor. The Central Blood Bank voluntarily provided all the information which plaintiff requested except for the name of the donor whose blood contained the HTLV-III virus.

Plaintiffs have scheduled the deposition of employees of the Central Blood Bank for the purpose of learning the identity of this donor. The Central Blood Bank has filed a motion for a protective order which requests this court to protect the anonymity of its donor.

Pa.R.C.P. 4003.1 permits discovery to extend to any matter which is relevant to the subject matter of the pending action, including the identity and whereabouts of witnesses. In this case, the identity of the donor is relevant to plaintiffs' case.

In December 1982, researchers first learned that AIDS may be transmitted through blood transfusions. On January 13, 1983, the American Red Cross, the American Association of Blood Banks and the Council of Community Blood Banks (the three organizations which represent the interests of blood banks at a national level) issued a *Joint Statement on Acquired Immune Deficiency Syndrome Related to Transfusion,* which recommended that high risk populations be excluded as blood donors. In March 1985, a test to detect exposure to the HTLV-III virus was first available to blood banks. Although the test does not exclude all blood containing the AIDS virus (so blood banks still seek to exclude high risk populations as donors), this is a highly accurate test in terms of identifying donors whose

blood may contain the HTLV-III virus. (The primary weakness of the test is its high false positive rate.) At this time, testing is mandatory.[1]

Since there was no test to determine if blood contained the HTLV-III virus at the time of plaintiff's open heart surgery, the only feasible screening device available to a blood bank was the use of procedures designed to exclude potential donors in a high-risk category — male homosexuals and intravenous drug users. Recommended procedures included requesting each potential donor not to donate blood if the donor was in a high risk category and obtaining a medical history from each potential donor. By learning the identity of the donor, plaintiffs would very likely be able to learn whether the donor was in a high risk category at the time the blood was donated. If the donor was in a high risk category and if he states that he was informed by the blood bank not to donate blood but did so anyway, plaintiffs would very likely include this donor as a defendant. If the donor was in a high risk category and if he states that no personal history was taken or that he was never informed that he should not donate blood, he will be an important witness for plaintiffs for purposes of refuting the Central Blood Bank's contention that it utilized appropriate proce-

---

1. Sources for the information contained in this paragraph are Lipton, *Blood Donor Services and Liability Issues Relating to Acquired Immune Deficiency Syndrome,* 7 Journal of Legal Medicine, 131, 143-157; Witt, Warner & Stackpole, *AIDS and Patient Management: Legal, Ethical and Social Issues* — Part VI, HTLV-III Screening and the Blood Supply (National Health Publishing, 1986); Bove, *Transfusion-Associated Hepatitis and AIDS,* July 23, 1987 New England Journal of Medicine, 242-244; Meyer and Paukez, *Screening for HIV: Can We Afford the False Positive Rate,* July 23, 1987, New England Journal of Medicine, 238-241.

dures to exclude persons in high risk populations as donors.

While Rule 4003.1 permits discovery of any matter relevant to the preparation or trial of the action, a party's right to discovery is not absolute. The limitations of the scope of discovery are set forth in Pa.R.C.P. no. 4011. Subsection 4011(b) bars discovery of relevant information which "would cause unreasonable annoyance, embarrassment, oppression, burden or expense to the deponent or any other person or party" and subsection 4011(c) bars discovery of relevant information that "relates to matter which is privileged."

The Central Blood Bank contends that plaintiffs' discovery request is barred by Rule 4011(c) because the right of privacy recognized in the Pennsylvania and United States Constitutions prevents disclosure of the identity of a blood donor without the donor's consent. The Central Blood Bank also contends that plaintiffs' discovery request is barred by Rule 4011(b) because the protection of the identity of voluntary blood donors is an essential condition for obtaining the amount of blood necessary to meet the needs of the population.

I

Initially, we consider the Central Blood Bank's contention that the right of privacy recognized in the Pennsylvania and United States Constitutions prevents disclosure of the identity of a donor without the donor's consent. The blood bank has standing to raise the privacy claims of its donors because these privacy rights would not otherwise be protected. See *In re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 148, 415 A.2d 73, 76 (1980), and *Pennsylvania Dental Association v. Commonwealth of Pennsylvania, Department of*

*Health,* 75 Commw. 7, 461 A.2d 329 (1983), which permitted the treatment provider to raise the privacy claims of its patients.

None of the decisions of the United States Supreme Court which consider the parameters of the constitutional right of privacy resolves the blood bank's claim that the anonymity of its donors is constitutionally protected. Also, there is very limited case law in Pennsylvania addressing the claim that the constitutional right of privacy bars disclosure of medical information.

In the case of *In re "B", Appeal of Dr. Loren Roth,* 482 Pa. 471, 394 A.2d 419 (1978), the opinion of Justice Manderino writing for the court (in which only one other justice joined) held that the constitutional right of privacy barred a court from compelling a psychiatrist to reveal the contents of the psychiatric records of a patient without that patient's consent even though such records were relevant to the issue of whether the juvenile court should return a child to the patient. In *Stark Dental Associates v. Medical Service Association of Pennsylvania,* 11 D.&C.3d 699 (1978), the principles enunciated in the Manderino opinion in *In re "B", Appeal of Dr. Loren Roth, supra,* were extended to support a holding that the constitutional right of privacy prohibits disclosure of dental patients' names. In *Pennsylvania Dental Association v. Commonwealth of Pennsylvania, Department of Health, supra,* the Commonwealth Court found the claim that a constitutional right of privacy bars a court from compelling the disclosure of dental patients' names to be substantial while deciding the case on other grounds. In *Sanderson v. Bryan, M.D., Ltd.,* 361 Pa. Super. 491, 522 A.2d 1138 (1987), one of several reasons given for construing the Peer Review Protection Act (Act of July 20, 1974, P.L. 564,

no. 193, as amended, 63 P.S. 425.1 et. seq.) to protect from discovery peer review of treatment provided to patients who are not parties to the litigation was that "by allowing a plaintiff access to the medical records of other patients, the right to privacy of those other patients is violated." 361 Pa. Super. at ____, 522 A.2d at 1142. Also see *Lunderstadt v. Pennsylvania House of Representatives Select Committee,* 513 Pa. 236, 519 A.2d 408 (1986), in which the opinion of the court, joined in by two other justices, barred a legislative investigating committee from obtaining via subpoena financial records of family members of persons whose business affairs are the subject of a legislative investigation in the absence of a showing of probable cause that the records contain evidence of wrongdoing, on the ground that the disclosure violates a right of privacy found in Article I, section 8 of the Pennsylvania Constitution. See also *Denoncourt v. Commonwealth of Pennsylvania State Ethics Commission,* 504 Pa. 191, 470 A.2d 945 (1983), in which part two of the opinion of the court, joined in by two other justices, struck down legislation requiring elected officials to furnish detailed financial information of a spouse and minor children on the ground that such financial disclosure requirements violate the family members' right of privacy under Article I, section 1 of the Pennsylvania Constitution.

The only appellate court case law which has addressed a discovery request to compel a blood bank to disclose the identity of its donors is an opinion of the Florida Supreme Court in *Rasmussen v. South Florida Blood Bank Inc.,* 500 So.2d 533 (1987). In that case, during a hospitalization the plaintiff received fifty-one units of blood donated by fifty-one different donors. Subsequently, he was diagnosed as having AIDS. In an effort to prove that the source of the AIDS was the blood received during his hos-

pitalization, he sought to obtain from the blood bank that had furnished the blood the identities of the fifty-one donors. The blood bank opposed the discovery request on the same bases that the Central Blood Bank opposes the discovery request in this case — the donors' constitutional right of privacy and the chilling effect that disclosure of the identity of blood donors would have on the willingness of persons to donate blood.

The Florida Supreme Court's opinion dealt primarily with the right of privacy objection to the discovery request. In the Florida case, it was not known whether the blood donations were the cause of the AIDS. The names and addresses of the fifty-one donors were sought so plaintiff could conduct an investigation into the lives of each of the donors for the purpose of determining whether the donor was in a high risk category. The court barred the discovery on the bases that "the disclosure sought here implicates constitutionally protected privacy interests" (*Id.* at 537) and that "the prospect of inquiry into one's private life and potential association with AIDS will deter blood donation" (*Id.* at 537-8). In balancing the competing interests involved, the court said:

"[W]e find the discovery order requested here would do little to advance that interest (plaintiff's interest in proving the cause of his injury and obtaining full recovery). The probative value of the discovery sought by Rasmussen is dubious at best. The potential of significant harm to most, if not all, of the fifty-one unsuspecting donors in permitting such a fishing expedition is great and far outweighs the plaintiff's need under these circumstances." *Id.* at 538.

While the *Rasmussen* opinion supports the Central Blood Bank's position that a discovery request

for the identity of a blood donor involves important privacy and societal interests, *Rasmussen* is readily distinguishable. In the present case, the cause and source of plaintiff-husband's condition are known. The information which plaintiffs seeks is very likely to assist plaintiffs in litigating their claim. Also, the discovery request is limited to the identity of the person who donated the blood that infected plaintiff-husband. Thus, the *Rasmussen* court's major objection to the discovery request — that it would involve inquiries of blood donors whose blood did not infect the plaintiff — is not an issue in the present case.

On the basis of the United States and Pennsylvania case law which has included a persons's interest in avoiding disclosure of personal matters within the constitutional right of privacy (see e.g., *Whalen v. Roe,* 429 .U.S. 589, 599-600, 97 S. Ct. 869, 876 (1977); *In re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. at 150-1, 415 A.2d at 77; *Denoncourt v. Commonwealth of Pennsylvania State Ethics Commission,* 504 Pa. at 197-8, 470 A.2d at 948), we find to be substantial the blood bank's claim that the identity of its blood donors is constitutionally protected. At the same time because a person's interest in avoiding disclosure of personal matters is not absolute and because the discovery request in this case is narrow, it is not obvious that this discovery request is constitutionally barred. See e.g., *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 576-82 (3d Cir., 1980), in which the court held that "there can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection" (*Id.* at 577) but that some intrusion into the zone of privacy surrounding medical records is

permissible "after finding that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case" (*Id.* at 578).

"Thus, as in most other areas of the law, we must engage in the delicate task of weighing competing interests. The factors which should be considered in deciding whether an intrusion into an individual's privacy is justifed are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.* at 578.

In this case, it is not necessary to decide whether plaintiffs' discovery request is constitutionally barred by weighing the competing interests of plaintiffs and the donor because we conclude for the reasons set forth in part two of this opinion that the Central Blood Bank's motion for a protective order should be granted on the basis of its contention that its policy of protecting the identity of its blood donors should be honored.

## II

We conclude that plaintiffs' discovery request should be denied under Rule 4011(b) because of the chilling effect that disclosure of the identity of blood donors would have on the ability of the blood bank to obtain a sufficient supply of blood from voluntary donors.

As we previously discussed, there is no absolute right to discover relevant information because of the discretion given to the court in Rule 4011(b) to limit

or prohibit discovery which would cause "unreasonable annoyance, embarrassment, oppression, expense or burden to the deponent or any other person or party." Thus, in deciding whether to compel discovery, a court must balance the competing interests that would be served by granting or denying a discovery request.

The Central Blood Bank is a nonprofit corporation whose purpose is to gather and distribute blood and blood products in the Pittsburgh area. This blood bank is the principal source of whole blood and blood products in Western Pennsylvania. All of its donors are volunteers; none receives compensation for the donation. It is the expectation of the donor that any information which the blood bank obtains concerning the donor will be treated as confidential. The blood bank advises donors that their blood will be tested, that the donors will be informed if the tests disclose the presence of any disease, and that this information will not be disclosed to any other person not connected to the donation process.[2]

The policy of the Central Blood Bank of protecting the identity of its donors is consistent with the practices followed uniformly by blood banks throughout the United States. On July 29, 1985, hearings were conducted on the issue of the confidentiality of records of blood donors by the Subcommittee on Health and the Environment of the Committee on Energy and Commerce of the United States House of Representatives (99th Cong., 1st Ses., Serial No. 99-45, pp. 111-202). Witnesses included Dr. Frank E. Young, Commissioner of Food and Drugs of the Department of Health and Human Services; Dr. Edward N. Brandt Jr., former Assistant Secretary of

---

2. The information in this paragraph was furnished through affidavits filed by the Central Blood Bank.

Health; Dr. Joseph R. Bove, Professor of Laboratory Medicine at Yale University School of Medicine and Chairman of the Committee on Transfusion Transmitted Diseases of the American Association of Blood Banks; Victor Schmitt, Vice-President of Medical Operations of the American Red Cross (the American Red Cross collects approximately one-half of the nation's blood supply); and Robert W. Reilly, President of the American Blood Resources Association. The witnesses uniformly testified that it has been the long-standing practice of those organizations involved in collecting and disseminating blood throughout the United States to maintain the confidentiality of information concerning blood donors (the only exception involves the dissemination of information to other blood banks or health agencies which protect donor confidentiality); that before the AIDS epidemic, there was little interest in obtaining information from blood banks; and that it is essential that the established policy of protecting the identity of donors apply to donors who have been exposed to the AIDS virus. Also see Witt, Warner & Stackpole, *AIDS and Patient Management: Legal, Ethical and Social Issues, supra;* Lipton, *Blood Donor Services and Liability Issues Relating to Acquired Immune Deficiency Syndrome, supra.*

This nation depends primarily upon volunteer donors for its blood supply. There is a National Blood Policy approved by the Department of Health, Education and Welfare of developing an all-voluntary blood donor system which provides a supply of blood and blood components adequate to meet the treatment and diagnostic needs of the population of this country. 39 Fed. Reg. 32,702 (1974). The subcommittee witnesses testified that the protection of this nation's voluntary blood donor system is the primary

rationale for the policy of this nation's blood banks of maintaining confidentiality of information concerning blood donors. People would be very reluctant to give blood if there was a possibility that the results of any testing would be provided to third parties without the donor's approval, if donors may be named as parties to lawsuits, or if the donation of blood involved them in any litigation.

AIDS is no longer restricted to the male homosexual or the drug addict. A substantial percentage of potential donors who are not in a high risk category know that there is a possibility (albeit remote) that they may have been exposed to the AIDS virus. The high false positive rate of the test to detect exposure to AIDS is also a matter of common knowledge. Persons who test positively for AIDS are likely to be socially ostracized and to lose their jobs if this information becomes known. Consequently, the dissemination of information that a donor may have been exposed to the AIDS virus could deter a significant segment of the population from donating blood.

Furthermore, AIDS is not the only disease that may be transmitted through a blood transfusion. The risk of being infected with hepatitis B through a blood transfusion appears to be substantially greater than the risk of being infected with AIDS. Bove, *Transfusion-Associated Hepatitis and AIDS, supra*. There is also a screening process for hepatitis B. Consequently, if the identity of a donor must be revealed in any lawsuit brought by a person possibly infected through contaminated blood, confidentiality would be significantly eroded.

The impact that any erosion of confidentiality would have on the supply of blood is not the only concern of the blood banks. Blood banks are required to obtain a medical history from each poten-

tial donor in order to protect the quality of the blood supply. Federal regulation requires that all donors be screened for "freedom from any disease transmissible by blood transfusion, insofar as can be determined by history and examinations." 21 C.F.R. § 640.3(b) (c) (1985). Three of the diseases screened through donor medical history — hepatitis B, syphilis, and AIDS — are transmitted primarily by sexual contact. This screening mechanism will be less reliable if prospective donors will be deterred from giving a complete and honest history. They will be deterred if they fear that the information in the health history may be disclosed to persons not connected to the donation process.

Finally, issues concerning the confidentiality of test results for blood donors testing positively for the AIDS virus intertwine with the larger policy of the confidentiality of AIDS testing in general. Presently, it is the position of most of those persons in the fields of public health, medical research, and treatment of AIDS that disclosure of test results (except in limited circumstances) would be counterproductive. At this time, most public health officials believe that the best strategy for limiting the spread of AIDS is to encourage the segments of the population most likely to be infected voluntarily to come forward for testing and through education and counseling to persuade those who are found to be AIDS carriers to refrain from engaging in activities that will infect others. The guarantee of confidentiality is the cornerstone of this strategy because persons will not voluntarily come forth if positive test results may be disclosed to third persons.

Any court rulings that compel disclosure under rules of court governing discovery would significantly undermine this strategy. Even if a court opinion were narrowly drafted, it would be viewed by the

general public as eroding the guarantee of confidentiality. The issue of under what circumstances the identities of those testing positively for AIDS should be disclosed should be left to those who establish public policy on matters affecting the health of this nation. Such decisions will then (hopefully) be consistent with an overall strategy. Consequently, the impact of any court ruling compelling disclosure on public health policies governing AIDS is also a factor (although not controlling) in determining the merits of plaintiffs' request.

We recognize that the denial of plaintiffs' discovery request will preclude plaintiffs from bringing an action against the blood donor. However, plaintiffs probably have a limited interest in pursuing a claim against the donor because of the likelihood that any judgment obtained against this person could not be collected.

The Central Blood Bank is in all likelihood the target defendant. The denial of the discovery request does not significantly interfere with plaintiffs' ability to present its best case against the blood bank.[3] The blood bank voluntarily provided plaintiffs with information that should serve as a basis for establishing that the blood furnished by the blood bank was the source of the AIDS virus. The remaining issue will be whether the blood bank took appropriate steps to discourage persons in high risk categories from donating blood. The jury's finding will turn on whether the procedures which the blood bank states that it used were reasonable and whether the blood bank followed those stated procedures.

---

3. Plaintiffs may recover against the Central Blood Bank only upon a showing of negligence. The legislature has barred recovery for death, disease, or injury resulting from the lawful transfusion of blood "by reason of any rule of strict liability or implied warranty." 42 Pa.C.S. §8333.

Plaintiffs need not produce the donor to establish a case against the blood bank. The jury will be instructed that the donor's identity is legally protected. The jury will be permitted to find that the donor knew that he was in a high risk category when he donated the blood in question through expert testimony which will establish that over 90 percent of the adults who had contracted AIDS in 1985 were in a high risk category. In determining whether the blood bank followed its procedures, the jury may consider that a person in a high risk category would not be likely to donate blood if properly informed of the risks.[4] Even if the donor's identity were revealed and the donor testified that he had not been informed that persons in a high risk category should not donate blood, this would not resolve that issue. The blood bank would argue that the donor was either lying to protect himself or that his testimony was not credible. Thus, the jury would still be faced with determining whether the blood bank's procedures were adequate if followed, and whether these procedures provided sufficient safeguards to ensure that they were compiled with.

Finally, we do not believe that a decision to protect the identity of donors will diminish the interest of blood banks in providing a safe product. Even if this protection may lessen the threat of litigation against blood banks, the lawsuit is not the primary deterrent against negligent practices of a blood bank. A blood bank's consumers are a small group of knowledgeable health care providers who will recognize problems with the product and are in a

---

4. Central Blood Bank makes no payments for blood. All donors are volunteers. A volunteer donor in a high risk category has no incentive to donate blood to the blood bank.

position to demand corrective action under the threat of obtaining blood products elsewhere. Furthermore, blood banks which rely solely on volunteer donors depend upon the goodwill of the community to obtain their supply of blood. Concerns about the blood bank's practices will be immediately addressed to prevent unfavorable publicity.

For these reasons, we enter the following order of court:

## ORDER

On this August 12, 1987, it is hereby ordered that the motion for a protective order of the Central Blood Bank is granted and that the Central Blood Bank is not required to disclose the identity of any blood donors.