593 A.2d 318

WILLIAM AND ROSLYN SNYDER, PLAINTIFFS-RESPONDENTS, v. HAROUTUNE MEKHJIAN, M.D., INDIVIDUALLY AND HAROUTUNE MEKHJIAN, M.D., P.C.; YOUNGICK LEE, M.D.; WILMO OREJOLA, M.D.; ANTHONY LOSARDO, M.D.; LEONARD SAVINO, M.D.; JOHN DOE, M.D.; A FICTITIOUS NAME; RICHARD ROE, M.D.; A FICTITIOUS NAME; JOHN ROE, M.D., A FICTITIOUS NAME; JOHN SMITH, M.D., A FICTITIOUS NAME; JOHN JONES, M.D., A FICTITIOUS NAME; ST. JOSEPH'S HOSPITAL; ST. JOSEPH'S BLOOD BANK; ANTHONY PASSARO, W BLOOD BANK, A FICTITIOUS NAME; DR. JOHN KALIAN; Y BLOOD BANK, A FICTITIOUS NAME; Z BLOOD BANK, A FICTITIOUS NAME; XYZ BLOOD BANK, A FICTITIOUS NAME; JANE DOE, A FICTITIOUS NAME; RICHARD ROE, A FICTITIOUS NAME; JOSEPH WILLIAMS, A FICTITIOUS NAME; JOSEPH ROGERS, A FICTITIOUS NAME; GREGORY SMITH, A FICTITIOUS NAME; JOSEPH SMITH, A FICTITIOUS NAME; JANE SMITH, A FICTITIOUS NAME; WILLIAM SMITH, A FICTITIOUS NAME; INDIVIDUALLY AND AS AGENTS, EMPLOYEES AND SERVANTS OF ST. JOSEPH'S HOSPITAL, DEFENDANTS, AND BERGEN COMMUNITY BLOOD CENTER, DEFENDANT-APPELLANT, AND LAWRENCE WILKINSON, M.D. AND AMERICAN ASSOCIATION OF BLOOD BANKS, DEFENDANTS-RESPONDENTS.

Argued May 6, 1991—Decided July 31, 1991.

_Roger G. Ellis_ argued the cause for appellant (_Bumgardner, Hardin & Ellis_, attorneys; _M. Christie Wise_, on the briefs).

_Edwin R. Matthews_ argued the cause for respondent American Association of Blood Banks (_Cuyler, Burk & Matthews_,

attorneys; *Edwin R. Matthews* and *Karla M. Donovan*, on the brief).

*Peter L. Korn* argued the cause for respondent Lawrence Wilkinson, M.D. (*McDonough, Korn & Eichhorn*, attorneys; *Thomas M. Moriarty*, on the briefs).

*George T. Baxter* argued the cause for respondents William and Roslyn Snyder.

*Robert W. Donnelly, Jr.*, submitted a letter in lieu of brief on behalf of defendants Haroutune Mekhjian, M.D. and Youngick Lee, M.D. (*Dughi and Hewitt*, attorneys).

*Milton Gurny* submitted a letter brief on behalf of defendant St. Joseph's Hospital and Medical Center (*Hein, Smith, Berezin, Maloof, Spinella & Rodgers*, attorneys).

*Michael J. Haas*, Deputy Attorney General, submitted a letter in lieu of brief on behalf of *amicus curiae* State Department of Health (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney).

PER CURIAM.

The judgment is affirmed, substantially for the reasons expressed in the Appellate Division opinion, reported at 244 *N.J.Super.* 281, 582 *A.*2d 307 (1990).

POLLOCK, J., concurring.

We granted defendants' motion for leave to appeal, —— *N.J.* —— (1991), to consider whether a patient who alleges that he received an HIV-positive blood transfusion may obtain limited discovery from the donor when the patient also alleges that a blood bank negligently supplied the blood. In holding in favor of such discovery, the Appellate Division relied on *N.J.S.A.* 26:5C–9, which permits disclosure for good cause of information regarding a person who has Acquired Immune Deficiency Syndrome (AIDS) or is infected with the Human Immunodeficiency Virus (HIV). 244 *N.J.Super.* 281, 582 *A.*2d 307 (1990). This Court now affirms on the opinion below. I concur with that

opinion and write separately to emphasize the Court's reliance on the statutory balance of the donor's privacy interest, the plaintiffs' interest in full discovery and compensation for the injuries they have sustained, and society's interest in a safe and adequate blood supply. Our reliance on *N.J.S.A.* 26:5C–9 is consistent with prior decisions of this Court and illustrates the proper roles of the legislature and the judiciary in cases involving law and bioethics.

–I–

Because this matter arises on an interlocutory appeal from a discovery order and cross-motions for summary judgment, the record, although voluminous, is less complete than it would be after a plenary hearing. From the record, the following facts appear. In August 1984 plaintiff William Snyder underwent open heart surgery at St. Joseph's Hospital in Paterson. In the course of the surgery, he received transfusions of several units of blood products, including one of platelets, unit 29F0784. Defendant Bergen Community Blood Center (BCBC) had collected blood for that unit at a bloodmobile in Hackensack. BCBC is a member of defendant American Association of Blood Banks (AABB), a non-profit association of non-profit banks, the members of which collect about one-half of the nation's blood supply. The American Red Cross collects the other half.

According to BCBC, it made available to donors an AIDS information sheet, captioned "AN IMPORTANT MESSAGE TO ALL BLOOD DONORS." The sheet described AIDS:

*WHAT IS AIDS?*

AIDS or Acquired Immune Deficiency Syndrome is a condition in which the body's normal defense mechanisms against certain diseases or conditions are reduced. As a result, patients often develop unusual infections such as Pneumocystis pneumonia or a rare form of skin cancer, Kaposi's sarcoma. There is no known cause, preventative measure, laboratory test, or treatment for AIDS.

It also identified those at risk:

WHO IS AT RISK?

It is known, however, that certain groups are at a high risk of contracting the disease. These include:

* those with symptoms and signs suggestive of AIDS;
* sexual partners of AIDS patients;
* sexually active homosexual or bisexual men with multiple partners;
* Haitian entrants to the United States;
* present or past abusers of intravenous drugs;
* patients with hemophilia; and
* sexual partners of individuals at increased risk of AIDS.

The sheet concluded with the request:

Your blood bank is asking that you voluntarily refrain from donating at this time if you are in any of the currently identified high-risk groups. Although the majority of members of these groups are not carriers, there is presently no means of detection and thus no mechanism to identify those few who may be at risk.

BCBC also asserts that it took a medical history from donors asking twenty-nine questions, including:

Are you in general good health?

Ever injected yourself with any drugs?

Signs of swollen glands or Kaposi's sarcoma?

The apparent purpose of these questions was to discover whether the donor was a member of the "identified high risk groups," which include intravenous drug users and sexually active homosexual and bisexual males. Concerning the last question, Kaposi's sarcoma is "a manifestation of a new immunodeficiency syndrome and since has been the initial manifestation of AIDS in approximately 30% of reported cases. AIDS-associated Kaposi's sarcoma has remained predominantly a disease of homosexual and bisexual men, although it has been reported among all high-risk groups." R. Gray & L. Goody, *Attorney's Textbook of Medicine* para. 46.51 at 46–48 (3d ed. 1988). According to BCBC, the donor gave negative responses to each of the questions.

The parties disagree on the effectiveness of then-existing tests to determine if blood products were infected with HIV, the cause of AIDS. They agree, however, that starting in 1985 the enzyme-linked immunoabsorbent assay screening test (the ELISA test) enabled blood banks to screen blood for the HIV

virus.  Except for a two-to-six-month "window" following a person's exposure to the HIV virus, the ELISA test reveals whether a prospective donor has an HIV infection.  As part of a nationwide "look back" program conducted by AABB, BCBC ascertained in 1986 that a donor who had contributed to unit 29F0784 was HIV positive.  Under the program, when a prospective blood donor tested HIV positive, the blood bank conducted a review to determine whether the donor had made donations before the development of the ELISA test.  BCBC informed St. Joseph's that one of the donors to unit 29F0784 had tested HIV positive.  St. Joseph's notified Snyder's doctor, who in turn informed Snyder in 1987.  Snyder, who was not otherwise at risk, tested HIV positive.

Alleging that the transfusion of platelets had infected him, Snyder and his wife, Roslyn, instituted this action in 1989 against BCBC, its director, St. Joseph's Hospital, and others. Plaintiffs allege in part that BCBC was negligent in its screening of donors.  BCBC denies both that it was negligent and that unit 29F0784 was HIV infected, notwithstanding BCBC's discovery in 1986 that one of the contributors was HIV positive. Thus, both negligence and causation are at issue.  As part of their pre-trial discovery, plaintiffs seek limited discovery of the donor on both issues.  In particular, they want to discover whether in 1984 the donor was HIV infected and whether BCBC followed its own screening procedures.  Plaintiffs do not seek the identity of the donor or of the donor's acquaintances, nor do they intend to sue the donor.

After deleting the donor's name and address, BCBC produced the donor's records, but it opposes further discovery.  The Law Division found that the donor's interest in confidentiality outweighed plaintiffs' interest in obtaining the information.  Finding also that "[t]here is no basis to conclude that [BCBC] did something wrong," the court denied plaintiffs' motion.

The Appellate Division granted plaintiffs' motion for interlocutory relief and reversed.  Although it left it to the trial court

to determine the extent of discovery, the Appellate Division held that "some access [to the donor] under careful court supervision is appropriate and justifiable." 244 *N.J.Super.* at 296, 582 *A.*2d 307. Writing for a unanimous court, Judge Pressler suggested that either a "veiled" deposition or one conducted on written interrogatories might provide plaintiffs adequate discovery and also protect the donor's privacy interests. *Id.* at 297, 582 *A.*2d 307.

--II--

In the absence of legislative guidance, courts in other states have divided over the rights of an AIDS-infected blood recipient to make discovery of the donor. Some courts have denied access to the donor because of the donor's privacy interests, *see Bradway v. American Nat'l Red Cross*, 132 *F.R.D.* 78 (N.D.Ga. 1990); society's interest in an adequate blood supply, *see Coleman v. American Red Cross*, 130 *F.R.D.* 360 (E.D.Mich.1990); *Taylor v. West Penn Hosp. Central Blood Bank*, 48 *Pa.D. & C.*3d 178 (Common Pleas 1987); the physician-patient privilege, *see Krygier v. Airweld*, 137 *Misc.*2d 306, 520 *N.Y.S.*2d 475 (Sup.Ct.1987); or a combination of these factors, *see Doe v. American Red Cross*, 125 *F.R.D.* 646 (D.S.C.1989); *Rasmussen v. South Fla. Blood Serv.*, 500 *So.*2d 533 (Fla.1987); *Laburre v. East Jefferson Gen. Hosp.*, 555 *So.*2d 1381 (La.1990). Other courts, however, have found support for limited discovery of a donor in the public policy favoring compensation of injured parties, the plaintiff's correlative interest in full discovery, and society's interest in a safe blood supply. *See Boutte v. Blood Sys., Inc.*, 127 *F.R.D.* 122 (W.D.La.1989); *Mason v. Regional Medical Center of Hopkins County*, 121 *F.R.D.* 300 (W.D.Ky. 1988); *Belle Bonfils Memorial Blood Center v. District Court*, 763 *P.*2d 1003 (Colo.1988); *Stenger v. Lehigh Valley Hosp. Center*, 386 *Pa.Super.* 574, 563 *A.*2d 531 (1989), *appeal granted*, 525 *Pa.* 618–20, 577 *A.*2d 890–91 (1990); *Gulf Coast Regional Blood Center v. Houston*, 745 *S.W.*2d 557 (Tex.Ct.App.1988), *Tarrant County Hosp. Dist. v. Hughes*, 734 *S.W.*2d 675 (Tex.

Ct.App.1987), *cert. denied,* 484 *U.S.* 1065, 108 *S.Ct.* 1027, 98 *L.Ed.*2d 991 (1988).

Commentators also have divided on the issue. Some favor disclosure. They argue that discovery need not excessively threaten the donor's privacy interest, Turkington, *Confidentiality Policy for HIV-Related Information: An Analytical Framework for Sorting Out Hard and Easy Cases,* 34 *Vill. L.Rev.* 871 (1989); Note, *Aids Related Litigation: The Competing Interests Surrounding Discovery of Blood Donors' Identity,* 19 *Ind.L.Rev.* 561 (1986), and that limited disclosure of the donor's identity does not jeopardize the nation's blood supply, Jenner, *Identifying HIV-infected Blood Donors,* 25 *Trial* 47 (June 1989). Others oppose disclosure of the donor's identity. They contend that such disclosure will deter potential donors from giving blood, thereby reducing the blood supply. *E.g.,* Note, *AIDS: Anonymity In Donation Situations— Where Public Benefit Meets Private Good,* 69 *B.U.L.Rev.* 187 (1989). Still others argue that the donor's privacy interest, the physician-patient privilege, and the needs of the nation's blood supply weigh against discovery. Bollow & Lapp, *Protecting the Confidentiality of Blood Donors' Identities in Aids Litigation,* 37 *Drake L.Rev.* 343 (1987–88).

Unlike other courts, we have the benefit of legislative guidance. In the AIDS Assistance Act (the Act), *N.J.S.A.* 26:5C–1 to –14, the Legislature proclaimed: "The effective identification, diagnosis, care and treatment of persons who have contracted [AIDS], is of paramount public importance." *N.J.S.A.* 26:5C–2a. The Legislature recognized that "the outbreak of AIDS has reached alarming proportions because of its highly contagious nature with New Jersey ranking fourth in the nation of the number of reported cases." *N.J.S.A.* 26:5C–2g. Finally, the Legislature found that AIDS "may be spread through body secretions, especially blood and semen," *N.J.S.A.* 26:5c–2b, and "is now striking * * * persons who have received blood transfusions * * *," *N.J.S.A.* 26:5C–2d.

Like other cases involving law and bioethics, this case raises questions not only about competing legal and ethical interests, but also about the proper roles of courts and legislatures in considering those interests. In a morally pluralistic society, the legislature, consisting of the elected representatives of the people, is better suited than the judiciary to weigh the competing values. The legislative process is designed for gathering information from numerous sources relatively free from time constraints. By comparison, courts are generally confined to the adverse interests of a limited number of parties in a solitary case. When the legislature fails to act, however, courts may be obliged to resolve disputes based on common-law or constitutional rights. Even after the legislature acts, courts may review legislation to determine if it infringes on constitutional rights or supplements common-law rights. In sum, matters involving law and bioethics require each branch of government to respect the responsibilities of the others.

Consistent with those precepts, this Court has tended to defer to the Legislature in bioethical issues. Even when recognizing a "right to die" based on constitutional law, *In re Quinlan,* 70 *N.J.* 10, 355 *A.*2d 647, *cert. denied,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976), or the common law, *In re Jobes,* 108 *N.J.* 394, 424, 529 *A.*2d 434 (1987); *In re Peters,* 108 *N.J.* 365, 385, 529 *A.*2d 419 (1987); *In re Farrell,* 108 *N.J.* 335, 341–42, 529 *A.*2d 404 (1987); *In re Conroy,* 98 *N.J.* 321, 344–45, 486 *A.*2d 1209 (1985), we have sought legislative guidance. Likewise, when considering the issue of surrogate parenthood, we have deferred to the balance of interests struck by the Legislature in statutes pertaining to custody and adoption. See *In re Baby M,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988). Similarly, we have held that the admission of AIDS-infected children to public schools is controlled by administrative regulations promulgated by the Departments of Health and Education. *Board of Educ. v. Cooperman,* 105 *N.J.* 587, 523 *A.*2d 655 (1987). So, too, here the appropriate judicial response is to follow the Legislature's lead.

The Act provides in relevant part that a record maintained by a blood bank, "which contains identifying information about a person who has or is suspected of having AIDS or HIV infection is confidential and shall be disclosed only for the purposes of this act." *N.J.S.A.* 26:5C–7. Another section, *N.J.S.A.* 26:5C–9a, however, specifically authorizes disclosure pursuant to court order for good cause. In that section, the Legislature has struck the balance among the interests of the donor, donee, and society. The statute provides:

> The record of a person who has * * * HIV infection may be disclosed by an order of a court of competent jurisdiction which is granted pursuant to an application showing good cause therefor. At a good cause hearing the court shall weigh the public interest and need for disclosure against the injury to the person who is the subject of the record, to the physician-patient relationship, and to the services offered by the program.

Notwithstanding some imprecision in the Act, a blood bank, as all parties acknowledge, is a "program" within the Act's meaning. Accordingly, statutory requirements apply to the records of blood banks. *N.J.S.A.* 26:5C–7f. Under the statute, the judicial role is to conduct a hearing to determine whether good cause exists to disclose the HIV-infected donor's record. In the context of the present case, the statute mandates that a court should weigh the public interest and plaintiffs' need for limited discovery from the donor against injury to the donor, the physician-patient relationship, and a safe and adequate blood supply. Interests on both sides of the equation are important and deserve careful consideration.

Resolution of this matter involves both the application of *N.J.S.A.* 26:5C–9 and the determination whether that statute impermissibly infringes on the donor's constitutional right of privacy. I conclude that plaintiffs have established good cause and that the statute does not violate those rights.

–III–

On the facts of this case, the least troublesome interest under *N.J.S.A.* 26:5C–9a is the physician-patient relationship. Defendants base their claim of injury to that relationship on the

physician-patient privilege. Although this Court has never adopted that privilege, the Legislature has done so in *N.J.S.A.* 2A:84A–22.2, limiting it to situations in which "the patient or the physician reasonably believed the communication to be necessary or helpful to enable the physician to make a diagnosis of the condition of the patient or to prescribe or render treatment therefor * * *." *N.J.S.A.* 2A:84A–22.2(b).

As we have stated, "the purpose of the privilege is to permit patients to disclose facts necessary for diagnosis and treatment." *State v. Dyal*, 97 *N.J.* 229, 237, 478 *A.*2d 390 (1984). Consistent with that statement, the statute expressly declares that for the privilege to apply, the court must find that the communication was for the purpose of diagnosis and treatment. *See N.J.S.A.* 2A:84–22.1 (defining "patient" as a person who consults a physician "for the purpose of securing preventive, palliative, or curative treatment"); *N.J.S.A.* 2A:84A–22.2 (limiting privilege to communications patient or physician "reasonably believed * * * to be necessary or helpful to enable the physician to make a diagnosis of the condition of the patient or to prescribe or render treatment therefor"). The Act defines "diagnosis and treatment" as "services or activities carried out for the purpose of, or as an incident to, diagnosis, prevention and treatment of AIDS and HIV infections and includes interviewing and counseling." *N.J.S.A.* 26:5C–5. A blood donation by one person for the benefit of another does not involve either diagnosis or treatment within the statutory privilege. The clear majority of out-of-state courts that have considered the issue also have concluded that the physician-patient privilege does not apply to a blood transfusion. *See Belle Bonfils Memorial Blood Center, supra*, 763 *P.*2d at 1009; *Laburre, supra*, 555 *So.*2d at 1383–84; *Doe v. University of Cincinnati*, 42 *Ohio App.*3d 227, 229–31, 538 *N.E.*2d 419, 422–23 (1988); *Stenger, supra*, 386 *Pa.Super.* at 586–87, 563 *A.*2d at 537–38; *Hughes, supra*, 734 *S.W.*2d at 677. *But see Krygier, supra*, 137 *Misc.*2d at 308–09, 520 *N.Y.S.*2d at 476–77 (finding privilege

applicable to blood donation). In sum, the physician-patient privilege does not apply to blood donations.

Weighing the donor's privacy interest is more difficult. Plaintiffs do not challenge defendants' standing, and like the parties, I assume that defendants may assert that interest. The analysis of harm to the donor from disclosure begins by recognizing that no disease in modern history has engendered so much attention, fear, and even hysteria as AIDS. As Professor Larry Gostin has stated, "AIDS brings with it a special stigma." *Hospitals, Health Care Professionals, and AIDS: The "Right to Know" the Health Status of Professionals and Patients*, 48 *Md.L.Rev.* 12, 46 (1989). Victims of AIDS confront not only a deadly disease, but ostracism. Basic human decency, as well as the legislative mandate, suggests the need for limits on the otherwise-unfettered discovery that is the keynote of civil litigation. Because AIDS is transmitted by blood and semen as well as hypodermic syringes, unrestricted discovery could lead to inquiries about such matters as the identity of the donor's sexual partners, the donor's sexual habits, and his or her use of intravenous drugs. Such private matters are often placed beyond the limits of discovery.

Here, however, various considerations qualify the donor's expectation of privacy. According to BCBC, before drawing a donor's blood, it informs the donor that HIV infection is of critical concern and that anyone so infected should not donate blood. Furthermore, BCBC informs donors about high-risk activities and asks them to refrain from donating blood if they are at risk. It also questions donors about their medical history in a manner designed to ascertain whether any donor is a member of a high-risk group. The standard practice of blood banks is to maintain the confidentiality of those answers. The record before us, however, does not indicate that BCBC made any assurance of confidentiality to the donor who is the subject of plaintiffs' discovery motion.

Trial courts, moreover, can limit discovery to avoid excessive intrusions in deeply personal matters. Even in the ordinary case, litigants may not pry into every aspect of a witness's life. Under *Rule* 4:10-3, the trial court can limit the extent both of discovery and of public disclosure. Under *N.J.S.A.* 26:5C-9, the considerations that ordinarily limit disclosure apply with increased vigor when the witness is someone infected with AIDS. Judge Pressler concisely suggested some limitations that the trial court might apply in this case:

> If the donor is alive, the court shall determine procedures best calculated to provide plaintiff with the information he requires while giving maximum protection to the donor. For example, the donor's name need not be supplied if his "veiled" deposition is permitted. If such a deposition were to be permitted, the court could appropriately limit in advance the areas of questioning and impose such other conditions as would insure the donor's anonymity. If, on the other hand, only a deposition on written questions pursuant to *R.* 4:15 were permitted, the court could rule on the list of questions prior to their submission and permit an alias identification and oath. It may also be that the donor would have no objection to providing, openly and frankly, the information plaintiff requires or he may authorize his physician to do so. Thus it may also be prudent for the court itself initially to communicate with the donor. In addition, it is likely that the parties themselves will be able to suggest to the court further limitations on the substance of the inquiry and the technique by which it is to be pursued that will afford plaintiff a reasonable discovery opportunity at the least possible cost to the confidentiality interests here implicated. [244 *N.J.Super.* at 296-97, 582 *A.2d* 307.]

Thus, although possible injury to the donor is an important consideration, limited discovery need not impinge excessively on the donor's privacy interest.

The other interest that weighs in favor of confidentiality is the possible effect on the blood-banking system. Defendants hypothesize that permitting discovery of the donor will discourage future donors. They also contend that possible discovery procedures by third parties, such as plaintiffs, may discourage donors from giving honest answers in the screening process, thereby increasing the danger that those donors will contribute contaminated blood. They point to cases stating that discovery of donors will jeopardize the nation's blood supply. See *Bradway, supra,* 132 *F.R.D.* at 80; *Coleman, supra,* 130 *F.R.D.* at 362-63; *Doe v. American Red Cross, supra,* 125 *F.R.D.* at 652–

53; *Rasmussen, supra,* 500 *So.*2d at 537–38; *Laburre, supra,* 555 *So.*2d at 1384–85; *University of Cincinnati, supra,* 538 *N.E.*2d at 425; *Taylor, supra,* 48 *Pa.D. & C.*3d 178.

Acknowledging the speculative nature of the assertion, defendants concede that no study or statistics support their position. Arguably, moreover, the donors most likely to be discouraged from donating are those who are AIDS infected or who are members of high-risk groups. *See Boutte, supra,* 127 *F.R.D.* at 126 (noting disclosure will encourage blood banks to employ due care in collecting blood); *Stenger, supra,* 563 *A.*2d at 537 (finding no correlation between limited disclosure and reduced donations); *see also* Jenner, *supra,* 25 *Trial* 47 (arguing disclosure will benefit quality of blood supply). Finally, the record is barren of any support for defendants' argument that limited discovery procedures will discourage donors from honestly answering questions when being screened. In fact, since 1985, the accuracy of the ELISA test has diminished the importance of other forms of screening. The record simply does not support the hypothesis that subjecting donors to discovery procedures will significantly affect the safety or adequacy of the nation's blood supply.

Against the arguments favoring non-disclosure, the Legislature mandates that a court should weigh "the public interest and need for disclosure." *N.J.S.A.* 26:5C–9. Although the statute does not define "public interest," the phrase encompasses society's interest in compensating victims injured by the negligence of others. A corollary to that interest is the right to full discovery. *R.* 4:10–2(a). Any limitation on those rights suppresses relevant information and undermines the public interest of compensating victims of negligence.

In the present case, plaintiffs need to question the donor about two critical issues: causation and negligence. On the issue of causation, defendants deny that unit 29F0784 was contaminated. Similarly, they deny that the donor was HIV positive in 1984. In the absence of such information as the

donor may provide, plaintiffs will be confined to relying on an inference that because the donor tested positive in 1986, he was infected two years earlier at the time when his blood was drawn. Confronted with defendants' denial, plaintiffs' need to question the donor is obvious.

Judge Pressler's insightful opinion suggests the relevance of discovery on the negligence issue:

> Beyond that causation issue, plaintiff cogently asserts a need in respect of the question of BCBC's negligence. Illustratively, it was known before August 1984 that early symptoms of AIDS infection include particular lymph-node swelling and skin disorders, and, in fact, by 1983 the commercial blood bankers were conducting routine physical examinations of donors to determine the presence of these symptoms. Did the donor here have those symptoms then? Was he asked about them? Was he physically examined in this respect? Was he given the appropriate high-risk group self-screening information? Was a reasonable effort made to determine if he was in a high-risk category? Were his responses to the medical history questions accurately recorded? Were the questions adequately explained to him? Would present screening require-ments, short of laboratory testing, have revealed his AIDS infection? Undoubt-edly other relevant lines of interrogation would suggest themselves. All of this information is, in our view, highly pertinent to the issue of BCBC and AABB negligence and is, moreover, to a large extent not available from any source other than the donor himself. [244 *N.J.Super.* at 294–95, 582 *A.*2d 307.]

On balance, the statutory interest tilts in favor of limited discovery of the donor. A complete denial of discovery of the donor could subvert both the search for truth in civil litigation and the goals of tort law to deter negligence and to compensate injured parties. As suggested by the Appellate Division, the trial court can protect the donor's privacy by placing appropri-ate limits on discovery. Moreover, the effect on the blood-banking system of limited discovery of the donor is speculative. The conflicting arguments about any such effect proceed more from theory than from fact. In sum, plaintiffs have proved the good cause that justifies disclosure under *N.J.S.A.* 26:5C–9.

Plaintiffs do not request the name and address of the donor, and trial courts should scrutinize any such request in light of *N.J.S.A.* 26:5C–9. Non-disclosure of the donor's identity will inevitably restrict investigation of the donor and his past. Absent a showing of specific need, however, disclosure of the

donor's identity would appear to contravene the statute. More limited procedures, such as a veiled deposition or written interrogatories, should suffice.

–IV–

Claiming that the donor's interest in non-disclosure of his HIV infection is protected under the United States Constitution, defendants contend that *N.J.S.A.* 26:5C–9 violates the donor's right of privacy. I disagree. My reading of the decisions of the United States Supreme Court leads me to conclude that the statute affords sufficient protection to the donor's privacy to withstand a constitutional challenge.

The United States Supreme Court has identified two privacy interests protected by the federal constitution. One is concerned with autonomy, "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 *U.S.* 589, 599, 97 *S.Ct.* 869, 876, 51 *L.Ed.*2d 64, 73 (1977). The other interest is one of confidentiality, "the individual interest in avoiding disclosure of personal matters." *Id.* at 598–99, 97 *S.Ct.* at 876, 51 *L.Ed.*2d at 73. The protection of autonomy is limited to a few "fundamental" areas, including marriage, procreation, contraception, family relationships, child rearing, and education. *Paul v. Davis,* 424 *U.S.* 693, 713, 96 *S.Ct.* 1155, 1166, 47 *L.Ed.*2d 405, 420–21 (1976); *Roe v. Wade,* 410 *U.S.* 113, 152–53, 93 *S.Ct.* 705, 726, 35 *L.Ed.*2d 147, 176–77 (1973). Only a compelling state interest will justify government infringement in these areas. *Roe, supra,* 410 *U.S.* at 155–56, 93 *S.Ct.* at 728, 35 *L.Ed.*2d at 178–79.

Our concern in this case is with the confidentiality interest, an interest that has not fared as well as that of autonomy. Although the Supreme Court has considered the confidentiality interest three times in the last fifteen years, it has never found that a statute impermissibly infringes on it. In *Paul,* which dealt with the distribution of a flyer depicting the plaintiff as a shoplifter, the Court refused to extend "the substantive privacy

decisions," 424 *U.S.* at 713, 96 *S.Ct.* at 1166, 47 *L.Ed.*2d at 420, to include the plaintiff's claim "that the State may not publicize a record of an official act such as arrest." *Ibid.* Later the Court sustained a statute that authorized the State of New York to "record, in a centralized computer file, the names and addresses of all persons who had obtained pursuant to a doctor's prescription certain drugs for which there is both a lawful and an unlawful market." *Whalen, supra,* 429 *U.S.* at 591, 97 *S.Ct.* at 872, 51 *L.Ed.*2d at 68. Similarly, in *Nixon v. Administrator of General Services,* 433 *U.S.* 425, 97 *S.Ct.* 2777, 53 *L.Ed.*2d 867 (1977), the Court recognized that former-President Nixon had a privacy interest in his presidential tapes and papers. Nonetheless, the Court sustained a federal statute that required archivists to review presidential papers, including those pertaining to the President's personal affairs. These cases suggest that the Court considers a person's right of non-disclosure of personal matters not to be a fundamental right that triggers strict scrutiny. *See* R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law Substance and Procedure* § 15.7 at 84 (1986) (Rotunda) (right of non-disclosure not included among six categories of fundamental rights recognized by Court). Neither in *Whalen* nor in *Nixon* did the Court require the government to establish a compelling interest to justify its intrusion in the privacy interest at stake. Rather, the Court engaged in a balancing test weighing the personal nature of the information and the extent of the disclosure against the need for the information and the safeguards against undue disclosure.

The Supreme Court's restrained view of the confidentiality interest does not support the proposition that AIDS-infected blood donors possess a fundamental right of privacy. Instead, the Court's decisions lead to the conclusion that it has remitted to the legislative process the protection of the privacy concerns of those donors. If a statute is reasonable, it should withstand a constitutional challenge that it infringes on a right of privacy. Rotunda, *supra,* § 18.30 at 605.

No federal circuit court has found that a disclosure requirement infringes on a fundamental interest. Several circuit courts agree that a balancing test provides the proper framework for analysis of confidentiality interests. See *Fadjo v. Coon*, 633 *F.*2d 1172 (5th Cir.1981) (prescribing balancing test for determining whether disclosure by state officials of privileged discovery information constitutes violation of plaintiffs' constitutional rights); *United States v. Westinghouse Elec. Corp.*, 638 *F.*2d 570 (3d Cir.1980) (upholding statutory requirement that employers report to federal government portions of employees' medical records); *Plante v. Gonzalez*, 575 *F.*2d 1119 (5th Cir.1978), *cert. denied*, 439 *U.S.* 1129, 99 *S.Ct.* 1047, 59 *L.Ed.*2d 90 (1979) (upholding statutory requirement that certain state officials publicly disclose detailed information about their personal finances). Other courts have employed a different analysis. See *Kimberlin v. United States Dep't of Justice*, 788 *F.*2d 434 (7th Cir.), *cert. denied*, 478 *U.S.* 1009, 106 *S.Ct.* 3306, 92 *L.Ed.*2d 719 (1986) (finding no violation of right of confidentiality because plaintiff had no "reasonable expectation" of privacy in information disclosed); *J.P. v. DeSanti*, 653 *F.*2d 1080 (6th Cir.1981) (finding no "fundamental interest" implicated by State's disclosure of juveniles' "social history" during juvenile proceedings).

Defendants also cite two United States District Court opinions holding that the defendants had violated the plaintiffs' right of privacy by disclosing that the plaintiffs suffered from AIDS. Both cases are distinguishable. In *Woods v. White*, 689 *F.Supp.* 874 (W.D.Wis.), *aff'd*, 899 *F.*2d 17 (7th Cir.1990) (without opinion), the court found that prison medical personnel had violated the plaintiff's right of privacy by disclosing to non-medical personnel and to other inmates that the plaintiff, a prisoner, had tested positive for AIDS. The court recognized that in another case a countervailing governmental interest in disclosure could limit the plaintiff's right of privacy. In *Woods,* however, the defendants made "no claim that any important public interest was served in their discussion of plaintiff's

positive test for the AIDS virus." *Id.* at 876. By contrast, limited disclosure pursuant to *N.J.S.A.* 26:5C–9 involves a careful balancing of competing interests and furthers significant governmental interests including those in fair trials, the compensation of victims of negligence, and in a safe blood supply. Moreover, disclosure under the statute is made only after a court hearing and a careful balancing of those interests.

*Doe v. Borough of Barrington,* 729 *F.Supp.* 376 (D.N.J.1990), is also distinguishable. There, when the Barrington police arrested the plaintiff's husband, he informed them that he had tested HIV positive. On the same day, the plaintiff became involved in an unrelated incident in the Borough of Runnemede, when her car rolled into a neighbor's fence. The Barrington police told the Runnemede police that the plaintiff's husband had AIDS. In turn, the Runnemede police told the neighbor, who spread the information throughout the town. The next day eleven parents removed nineteen children from the school "due to a panic over [the plaintiff's] children attending the school. The media were present, and the story was covered in the local newspapers and on television." *Id.* at 379. Without any analysis, the court described the plaintiff's privacy interest as fundamental. It then found that "[t]he government's interest in disclosure does not outweigh the substantial privacy interest involved." *Id.* at 385. Like *Woods, Doe* did not involve limited disclosure pursuant to a statutory scheme. Indeed, the disclosure in *Doe* was broadcast throughout the community. Furthermore, the district court did not identify any governmental interest served by disclosure. In the present case, however, *N.J.S.A.* 26:5C–9 protects the confidentiality of the information about the donor and limits disclosure to the extent necessary to meet the needs of the injured party.

On its face, *N.J.S.A.* 26:5C–9 affords sufficient protection to the donor's privacy interest to withstand a constitutional challenge. In reaching that conclusion, I do not belittle the need for protecting the privacy of someone who tests HIV positive. AIDS carries with it an undeniable stigma. So does member-

ship in a high-risk group. The risk of public prejudice is real. To its credit, the New Jersey Legislature has assessed that risk and adopted a statute that balances the interests of the donor, the donee, and the public.

The preceding analysis leads to my disagreement with both the reasoning and result of the dissent. At the outset, the dissent substitutes its own analysis for that of the Legislature. Although I believe that *N.J.S.A.* 26:5C–9 provides the structure for analyzing the rights of the parties, the dissent relegates the statute to one of several factors included in its analysis. *Post* at 350, 593 *A.*2d at 329. Respect for the Legislature as a co-equal branch of government requires that we follow the analysis it has devised rather than devise one of our own. Nor would I preclude plaintiffs from questioning the donor merely because they cannot now prove that defendants were negligent. *Post* at 358, 593 *A.*2d at 334. It is enough that negligence is an issue. The purpose of discovery procedures is to help parties learn of facts relevant to the issues in the case. It would defeat that purpose to require a plaintiff to prove a defendant's negligence before propounding interrogatories and taking depositions. If, as the dissent fears, the donor is "very ill," *post* at 351, 593 *A.*2d at 330, the trial court may, on an appropriate application, restrict or even terminate discovery. The record before us, however, is silent on that issue.

Like the dissent, I am sensitive not only to the effect of discovery on the donor, but also to the possibility that another plaintiff in another case might intend to hold a donor liable. In this case, however, plaintiffs' counsel informed us at oral argument that plaintiffs have no such intent. Hence, we need not be deterred by the dissent's fear "that plaintiff's discovery motion might actually be an effort to cast a broad net to expose the liability of any party in the donation process and to create the basis for an additional lawsuit against the donor." *Post* at 356, 593 *A.*2d at 332. William Snyder entered St. Joseph's for heart surgery. He now tests HIV positive and is living a medical tragedy. The judicial system cannot restore his health,

but it can provide him with a reasonable opportunity to discover if defendants were negligent. Consequently, I agree with the Court that plaintiffs are entitled to limited discovery of the donor.

GARIBALDI, J., dissenting.

The sole issue raised in this interlocutory appeal is whether a nonprofit blood bank can be compelled to disclose the identity of a blood donor to a plaintiff who allegedly contracted Acquired Immune Deficiency Syndrome (AIDS) from the donor's blood and, if so, in what manner. Plaintiff alleges the negligence of the blood bank that collected and supplied the allegedly contaminated blood, and contends that he needs to question the donor to determine whether the blood bank screened the donor appropriately. The blood bank resists the discovery motion, arguing that the donor's privacy rights, coupled with the societal interest in a safe and adequate blood supply, outweigh plaintiff's need for information.

I

In 1984, plaintiff William Snyder [1] underwent surgery during which he was infused with various blood products. He recuperated successfully and left the hospital several weeks later.

By March 1985, tests became available to screen donated blood for antibodies to the Human Immunodeficiency Virus (HIV), which had been identified in April 1984 as the cause of AIDS. In October 1986, defendant Bergen Community Blood Center (BCBC), a nonprofit organization that collects and distributes donated blood, wrote to inform St. Joseph's Hospital that the donor of a certain unit of platelets had now tested positive for HIV antibodies.

---

[1] Although both William and Roslyn Snyder are plaintiffs in this action, for purposes of clarity references to plaintiff in the text refer specifically to William Snyder.

The identification of the unit with a donor who later tested HIV-positive came about as a result of the "look back" program. Under the program, a positive HIV-antibody test on blood subsequently donated by the same donor (here in May 1985) will cause blood collectors to follow up with the donor and hospitals that received distribution of blood products donated earlier by that person.

The hospital reviewed its records, ascertained that plaintiff had received the unit in question, and, in April 1987, informed plaintiff's physician of the information received from BCBC. The hospital offered its resources for testing and counseling of the patient. Plaintiff, who had no risk factors according to the physician's note on the hospital report, tested positive for the virus.

In February 1989, plaintiff sued the hospital, the physicians involved in his diagnosis and treatment, BCBC, and the American Association of Blood Banks (AABB). AABB, a national nonprofit association of nonprofit blood banks, oversees collection of approximately half of the nation's voluntarily-donated blood. The American Red Cross collects the remainder.

Plaintiff asserted strict-liability and negligence claims against all defendants. Following summary judgment motions by defendants, the trial court dismissed all claims except for the negligence claims against AABB, BCBC, and the surgeons, and the punitive damage claims against AABB and BCBC. The court also rejected BCBC's claims to charitable immunity pursuant to *N.J.S.A.* 2A:53A–7 and damage limitation under *N.J.S.A.* 2A:53A–8.

Plaintiff also requested the court to compel BCBC to produce its records of the anonymous donor of the unit in question. BCBC had provided plaintiff with full documentation of the screening process, with only the donor's name, address, and other identifying information redacted. The disclosed materials include a history and examination checklist of twenty-nine health-related questions presumably asked of the donor by an

examiner who signed the form, and a form in use at the time of the donation defining AIDS, specifying certain high risk groups and requesting that members of such groups voluntarily refrain from donating blood because of the risks posed by transfusion of blood products. The checklist also indicates that the donor gave negative responses to questions regarding self-injection with drugs, receipt of a tattoo or blood transfusion, and signs of certain symptoms of AIDS-related illnesses such as unexplained fever, night sweats, weight loss, and swollen glands or Kaposi's Sarcoma.

The trial court denied the discovery motion, reasoning that the donor's privacy rights and the deterrent effect that disclosure would have on future donors outweighed plaintiff's need to question the donor. Central to the court's ruling was its finding that the record, including the donor-information form with the donor's name redacted, revealed no indication of wrongdoing on the part of BCBC. The court stated in its oral opinion:

[F]rom the record there is no indication that there was any basis of excluding [the donor]. I realize that there's nothing further there and that you would like to find out if something further was done, but I find that in balancing your right to seek out the basis of a cause of action against the donor's rights of privacy with regard to his health in general and with regard to AIDS related complications in particular, would far outweigh your right to go seek a cause of action or the basis of a cause of action on the possibility rather than the probability that they did something wrong. There is no basis to conclude or infer that they did something wrong; and therefore, I will deny any access to the donor's records or access to having the—not to the donor's records—access to further interrogation or invasion of the privacy rights of the donor.

The court did assent to plaintiff's request for data, not including the identities, concerning four donees who had received other components of the donor's 1984 donation. The court explained that

[s]ince the causation is essential and there is sufficient indication, I will allow for a method of obtaining the information as to who—where the other four components from the same transfusion were sent, requiring the disclosure of whether or not subsequent testing was done, and if so, what was the results of the testing, if any other donor has subsequently died, the cause of death. I believe that that information is sufficient.

Plaintiff appealed from the dismissal of the strict-liability claims and the partial denial of the discovery motion. The Appellate Division affirmed the dismissal of the strict-liability claims, describing blood collected at the time in question as an "unavoidably unsafe" product, thereby precluding application of strict-liability principles to all in the collection and distribution chain. However, it found that "[t]he degree of plaintiff's injury, his right to redress from those who may have negligently failed to protect him, and his need for information which only the donor can provide if redress is to be obtained, all justify * * * limited disclosure * * * without unduly prejudicing the interests of the public and the donor's privacy rights." The court's ruling sanctioning limited disclosure instructed the trial court to allow plaintiff minimal contact with the donor to ascertain whether screening procedures were actually followed by the blood bank. The court suggested use of a "veiled" deposition or written interrogatories with questions that would receive prior approval by the court and an alias identification and oath.

In adopting the Appellate Division's opinion, this Court permits the scope of discovery to include the blood bank's disclosure, under protective conditions, of the donor's identity, medical records, and recollections of the pre-donation screening process.

## II

I agree with the majority that litigation regarding a blood bank's negligence in its collection process may result in a situation where *only* the donor of the allegedly HIV-infected blood can supply information critical to the lawsuit. However, I disagree that this case warrants such disclosure. Although I would not categorically foreclose a plaintiff's access in rare cases, several factors I highlight below represent points unacknowledged by the majority but nonetheless critical for a trial

court to consider before issuing an order for disclosure, however limited.

First, as with any order for discovery, a court must balance the requesting party's need for the information against the intrusiveness of the discovery process to the subject party. *See In re W.C.*, 85 *N.J.* 218, 224, 426 *A.*2d 50 (1981) ("Whether discovery should be expanded involves ... balancing the beneficial effects of discovery against its disadvantages."). Here, obvious considerations include the fact that if the donor is still alive (nearly 90% of those in New Jersey diagnosed with AIDS in 1985 are not alive; roughly 70% of those who were diagnosed three years later have also died)[2], the donor may be very ill, and contact, even in the form of a veiled deposition or written interrogatories, may be significantly more burdensome than for a relatively healthy person. In addition to the potential personal stress of even minimal involvement with a lawsuit, a donor may desire to be represented by an attorney, adding a financial burden to the process. Also, if the donor has not disclosed to family, friends, or employers his or her HIV-status, any communication from a court or attorneys representing a blood bank or plaintiffs may unwittingly violate the donor's confidentiality.

In weighing those factors, the trial court must also consider the related statutory framework that specifically safeguards the confidentiality of people with AIDS. I rely on the Legislature's statutory guidance regarding confidentiality issues related to HIV-infection to determine the weight properly accorded to established principles of discovery. *N.J.S.A.* 26:5C–7 provides that records maintained by a blood bank that contain identifying information about a person who has or is suspected of having AIDS or HIV infection are confidential. Without prior written consent of the donor, the Act permits disclosure under extremely limited conditions. *N.J.S.A.* 26:5C–8. For

---

[2]New Jersey State Department of Health, AIDS Data Analysis Unit (as of April 30, 1991).

example, scientific research personnel may not disclose *in any manner* the identity of a person with AIDS. *N.J.S.A.* 26:5C-8b(1). Although the content of records may be released to qualified personnel for management audits, identifying information may not be released unless it is *vital* to the audit or evaluation. *N.J.S.A.* 26:5C-8b(2). Donors whose blood tests positive for HIV infection are placed on a confidential deferral list maintained by the blood bank. *N.J.A.C.* 8:8-6.5(f)(2). Even so, confidentiality remains so important that the names are not automatically transferred to a statewide deferral list. Rather, the Department of Health must deem the transfer to the statewide list appropriate. That list as well is confidential. *Ibid.*

The statute provides a narrow exception to the overarching policy of non-disclosure.

> The record of a person who has or is suspected of having AIDS or HIV infection may be disclosed by an order of a court of competent jurisdiction which is granted pursuant to an application showing good cause therefor. At a good cause hearing the court shall weigh the public interest and need for disclosure against the injury to the person who is the subject of the record, to the physician-patient relationship, and to the services offered by the program. Upon the granting of the order, the court, in determining the extent to which a disclosure of all or any part of a record is necessary, shall impose appropriate safeguards to prevent an unauthorized disclosure. [*N.J.S.A.* 26:5C-9.]

Even while providing a procedure for disclosure, the statutory language explicitly acknowledges the rights of the individual who is HIV positive and the importance of protecting that person's privacy, which is a primary aspect of the legislation glossed over by the concurrence.

Moreover, a court may limit or reject a motion for discovery in the interest of justice "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *R.* 4:10-3. Based on analogous rules, courts in other jurisdictions have rejected discovery requests similar to those made here. *See, e.g., Coleman v. American Red Cross,* 130 *F.R.D.* 360 (E.D.Mich.1990); *Doe v. American Red Cross Blood Servs.,* 125 *F.R.D.* 646 (D.S.C.1989); *Rasmussen v. South Florida Blood Serv., Inc.,* 500 *So.*2d 533 (Fla.1987);

*Laburre v. East Jefferson Gen. Hosp.*, 555 *So.*2d 1381 (La. 1990); *Krygier v. Airweld, Inc.*, 137 *Misc.*2d 306, 520 *N.Y.S.*2d 475 (Sup.Ct.1987); *Doe v. University of Cincinnati*, 42 *Ohio App.*3d 227, 538 *N.E.*2d 419 (1988); *Taylor v. West Pennsylvania Hosp.*, 48 *Pa.D. & C.*3d 178 (1987).

In *Doe v. American Red Cross Blood Servs.*, the plaintiff received an allegedly AIDS-contaminated blood transfusion in January 1985. The plaintiff contended that the defendant blood bank was negligent in its screening process and sought a "veiled" deposition of the donor. 125 *F.R.D.* at 647. Concluding that the donor's privacy interests and the potential harm to the nation's blood supply outweighed the plaintiff's need to question the donor, the court denied the plaintiff's discovery request. *Id.* at 655.

Similarly, in *Doe v. University of Cincinnati*, the plaintiff, who allegedly had contracted AIDS from a blood transfusion, contended that the supplying blood bank had been negligent in its screening methods. 538 *N.E.*2d at 424. The plaintiff had been reached as a result of a "look back" program and had tested positive for HIV antibodies. *Id.* at 421. The court denied the plaintiff's discovery request for the donor's identity because the plaintiff's need for the information was outweighed by the countervailing privacy interests of the donor and the need to maintain an adequate blood supply. *Id.* at 425. Those considerations also led the courts in *Krygier, Rasmussen, Taylor, Laburre,* and *Coleman* to deny discovery regarding donors whose blood had allegedly infected plaintiffs in those cases.

This Court has previously endorsed substantial safeguards for parties subject to discovery requests where the Legislature has indicated an intent to protect the class of which they are members. For example, we have required that a moving party make a " 'substantial showing of need and justification' " before it is entitled to an order to compel a psychiatric examination of a witness. *State v. R.W.*, 104 *N.J.* 14, 21, 514 *A.*2d 1287

(1986) (quoting *State v. Butler*, 27 *N.J.* 560, 605, 143 *A.*2d 530 (1958)). As an aid to courts exercising discretion in deciding discovery motions, this Court outlined an open-ended list of considerations, including "the burden imposed on the prosecution, the extent of inconvenience to prosecution witnesses, the inability or difficulty in having the witnesses appear, and the likelihood of subjecting witnesses to intimidation, unnecessary annoyance, harassment or embarrassment." *In re W.C.*, *supra*, 85 *N.J.* at 227, 426 *A.*2d 50.

In jurisdictions that have permitted some form of disclosure, courts have found either that the information sought from the donor was critical to plaintiff's cause of action or that evidence existed showing wrongdoing by the blood bank or donor. For example, in *Tarrant County Hosp. Dist. v. Hughes*, 734 *S.W.*2d 675 (Tex.Ct.App.1987), the defendant hospital, unlike the hospital in the instant case, made no effort to determine whether any of its donors had been diagnosed with HIV or AIDS. *Id.* at 676. The court found that plaintiff would not likely be able to prosecute her action without access to the donors' identities. *Id.* at 679. It consequently upheld the trial court's discovery order compelling the defendant hospital to disclose the donors' names and addresses with a provision that plaintiff neither publicly disclose the identities nor contact the donors without further court order. *Ibid.*

In *Belle Bonfils Memorial Blood Center v. District Court*, 763 *P.*2d 1003 (Colo.1988), the redacted screening records of a donor who tested HIV-positive revealed that the donor answered four questions in ways that might have required him to be deferred, depending on his answers to follow-up questions. The blood bank technician's handwritten notes did not reflect whether the technician had followed the blood bank's own guidelines, so the court determined that plaintiff's negligence claim required limited discovery. However, the court declined to permit an oral deposition, emphasizing that the donor's identity had to remain undisclosed. *Id.* at 1013. The court also rejected the use of written interrogatories because of the

donor's non-party status. *Ibid.* It concluded that a deposition on written questions was the only viable discovery technique, with the questions crafted so as not to reveal the donor's identity. *Ibid.* These cases illustrate the nature of a compelling need that a trial court might find justifies an order for limited discovery.

Second, a court must consider critically the potential probative value of the information requested in evaluating whether to order discovery. Because HIV-testing of donated blood became routine by March 1985, the subject time period for the instant case and similar lawsuits dates back over six years. Even if the donor's answers favor plaintiff, their utility will depend on the factfinder's confidence in the donor's memory of a short screening interview that occurred more than six years ago. That recall may be especially subject to doubt if the donor has since developed AIDS and undergone many medical treatments. Along those lines, a court may want to order a blood bank to disclose information regarding any prior or successive donations by the donor to better evaluate the possibility of obtaining useful information, given the small likelihood that someone who has donated numerous times will remember the screening procedures on a particular date. Such information should suffice to address plaintiffs' causation questions at this stage. Additionally, in seeking information on the employment of screening procedures in place at the time of the questioned donation, plaintiffs may be able to interview the employee who actually screened the donor as well as other employees who were instructed to follow the same screening procedures. Plaintiffs may cross examine the employees and call experts to challenge the meticulousness and consistency of employee adherence to procedures.

In evaluating a discovery request for a psychological examination of a young child, this Court emphasized the moving party's burden to show that the discovery will likely yield material evidence.

> Where * * * the defense merely raises the issue of potential incompetence without offering evidence impugning the witness' mental capacity, psychological stability or testimonial credibility, the request for an examination becomes only a fishing expedition. *The court must balance the possible emotional trauma, embarrassment, and intimidation to the complainant * * * against the likelihood that the examination will produce material, as distinguished from speculative, evidence.*
>
> [*State v. R.W., supra,* 104 *N.J.* at 28, 514 *A.*2d 1287 (emphasis added) (citations omitted).]

The Court emphasized that the possible evidentiary benefits to the moving party must outweigh the invasion of the witness's right to privacy if the discovery request is carried out. *Ibid.*

In considering the materiality of plaintiff's requests, the trial court ought also to be alert to whether plaintiff seeks to show the blood bank's negligence or actually intends to demonstrate the donor's negligence and ultimately to hold the donor liable. The court must remain sensitive to the possibility that plaintiff's discovery motion might actually be an effort to cast a broad net to expose the liability of any party in the donation process and to create the basis for an additional lawsuit against the donor.

This Court in *R.W.* also instructed that lower courts should consider the "danger to the public interest" that might occur if a discovery request is granted. *Ibid.* Here, the danger to the public interest may be substantial. Confidentiality has always been central to the blood donation process, in part because of the highly-personalized information requested of donors as part of the screening process. Removal of the assurance of confidentiality may have a chilling effect on the already-small pool of volunteers who donate blood. In light of the national blood policy commitment to maintain an all-volunteer blood donation system, 39 Fed.Reg. 32, 701 (1974), courts must be wary of taking any action that might reduce the willingness of people to donate blood and respond truthfully to screening procedures, which could in turn jeopardize the national blood supply. Courts and commentators have recognized that the prospect of court-ordered inquiry into a donor's personal life, medical history, and potential association with infectious diseases such as

AIDS is the kind of disincentive that could have a serious impact on the nation's blood supply. *See Rasmussen v. South Florida Blood Serv., supra,* 500 *So.*2d at 538; *LaBurre v. East Jefferson Gen. Hosp., supra,* 555 *So.*2d 1381; *Doe v. University of Cincinnati,* 42 *Ohio App.*3d 227, 538 *N.E.*2d 419. *See generally* Wyatt, Payne, Ingram & Quinley, *AIDS, Legal and Ethical Concerns for the Clinical Laboratory,* 4 *J.Med.Tech.* 108, 109 (1987) ("The decision as to whether the laboratory will be forced by the court to provide the names will have a profound impact upon voluntary donations.").

In rejecting a request by a plaintiff who allegedly contracted HIV from a blood transfusion to discover a donor's identity or to conduct a veiled deposition, the federal district court in South Carolina captured many of the concerns related to the public interest in the national blood supply:

The erosion of confidentiality may not only affect the quantity of the blood supply, it could well affect its safety. This is because the safety of the blood supply depends largely on donors' willingness to provide accurate and detailed histories of private and sometimes sensitive medical information, and some donors may be reluctant to supply accurate information out of fear that personal aspects of their lives may be disclosed to persons not connected to the donation process.

* * * * * * * *

In sum, assurances of confidentiality play a central role in maintaining a healthy and adequate blood supply. Permitting discovery of blood donors necessarily undermines the blood banks' assurances in that regard. If enough courts permit discovery of donors, blood banks, for purposes of ensuring that the consent of their donors is informed, will have to warn donors that they may be subject to questioning by litigants should their blood contaminate the recipient. Such a warning is likely to cause even the most civic-minded individual to think twice before voluntarily donating his blood to help another. [*Doe v. American Red Cross Blood Servs., supra,* 125 *F.R.D.* at 653 (citations omitted).]

The public interest must also be taken into account in assessing a discovery request like the one here. *See N.J.S.A.* 26:5C–9.

Similarly, a court should consider the actual use of any information obtained. Even if the donor offers recollections favoring the plaintiff, serious questions of the donor's credibility could arise if defendants do not have an opportunity for

cross-examination or their own deposition, which is likely given the priority on limiting a donor's involvement with the lawsuit for confidentiality and other reasons enumerated by the Appellate Division. Courts that permit the introduction of such evidence must consider how they will protect defendants' constitutional and statutory rights to confront witnesses presented by the opposing party.

## III

The painful reality of this case is that HIV-infection has caused both Mr. Snyder and the donor substantial suffering. In all likelihood, William Snyder contracted the HIV-virus in the course of heart surgery. The source of the donor's infection remains unknown. Clearly plaintiff's case arouses sympathy for the "innocent" manner in which he became ill. As so many sources remind us, the AIDS virus does not discriminate among its victims. Nor should this Court. Our sorrow at Mr. Snyder's anguish cannot displace our obligation to follow the Legislature's intent in administering discovery proceedings.

In these tragic cases there is no hard and fast rule on when access to a donor should be allowed. These cases are extremely fact-sensitive, and the courts must decide each case by balancing the interests of the plaintiff, the donor, and society. The determination of whether to authorize disclosure is best left to the trial court. Here, the trial court does not appear to have abused its discretion. As discussed above, the trial court concluded that the record provided no basis for a conclusion that the blood bank was negligent in screening the donor. It found further that the "possibility rather than the probability" of negligence did not outweigh the donor's privacy interest. The analysis neatly matches this Court's standard adopted for discovery requests of other protected classes that the moving party show a compelling need and justification for pursuing the information. See State v. R.W., supra, 104 N.J. at 21, 514 A.2d 1287.

The record before us supports the trial court's decision. Of course, should plaintiff make an additional showing that reflects a substantial need for the information, as well as a reasonable probability that the sought-after information exists and evidence that all other avenues to that information have been exhausted, the court should reconsider the discovery motion. There may be cases as well in which a donor would not feel burdened by the process. So not to prevent unnecessarily a willing witness from providing requested information, I would require the blood bank involved to inform the donor of the ongoing suit and discovery request. The donor may then choose to waive the privacy protections and respond to plaintiff's inquiries.

I perceive that plaintiffs rarely will be able to establish a compelling need and justification for donor information. However, when one does, a court should allow discovery limited to a narrowly-circumscribed procedure designed to obtain the relevant information while ensuring maximum protection of confidentiality to the donor. Although circumstances may occasionally warrant limited disclosure of a donor's identity, courts should be extremely wary of the complicated field on which they tread.

I would reverse the ruling of the Appellate Division and reinstate the trial court's order denying plaintiff's discovery motion.

Justice POLLACK, concurring in result.

*For Affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLACK, O'HERN and STEIN—6

*For Reversal*—Justice GARIBALDI—1